In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00142-CV
_____

IN THE INTEREST OF A.S.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 14-09-09968-CV

**MEMORANDUM OPINION**

After a bench trial, Appellant S.S. ("Susan")[1] appeals the trial court's order terminating her parental rights to her son, A.S. ("Adam"), an eight-year-old child.[2] The trial court also terminated the parental rights of Adam's father, A.I. ("Anthony").[3] For reasons explained herein, we affirm the trial court's judgment.

---

[1] To protect the identity of the minor, we use pseudonyms to refer to the child and his parents. *See* Tex. R. App. P. 9.8(b)(2).

[2] On January 16, 2018, the case was transferred from Harris County to Montgomery County for the convenience of the parties and witnesses and in the interest of justice, and the trial court found the transfer was in Adam's best interest.

[3] Anthony is not a party to this appeal, and we include limited details about him only as necessary to explain the facts.

1

Background

On July 10, 2019, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship. The petition named Adam as the subject of the suit, Susan as the child's mother, and Anthony as the child's father. At the time the petition was filed, Adam was six years old.

The petition was supported by an affidavit by a Child Protective Services (CPS) worker and representative, and the affidavit stated that, on May 19, 2019, the Department received a report of neglectful supervision, medical neglect, and physical neglect of Adam by Susan and her boyfriend at the time. According to the affidavit, the referral stated that Adam had a seizure disorder and had seizures because he was not taking his medication, Susan and her boyfriend used methamphetamine around Adam, there were needles lying around the "shack" where they lived, Adam was locked out of the shack all day, Adam was seen running around barefoot in sewage from toilets, Adam defecated on himself and did not bathe, and other people had to feed and bathe Adam.

According to the affidavit, Susan was uncooperative early in the investigation. In June 2019, the Department caseworker at the time learned from the District Attorney's office that Susan was arrested on May 23, 2019, for assaulting a nurse at

2

Memorial Hermann Kingwood Emergency. According to the person with the District Attorney's office (the DA), the report stated that Susan went to the emergency room with a wound on her head and admitted she had been using methamphetamine. The Department's affidavit stated that the DA told the Department that Susan swung a metal pole around at the hospital, and that Susan could be charged with a felony because the assault was against a public servant, a nurse. The person with the District Attorney's office provided the nurse's name and an offense report number. The caseworker contacted the District Attorney's office who confirmed that Susan did not appear at court on June 6, 2019, and a warrant was issued for her arrest.

The affidavit stated that on July 9, 2019, the caseworker contacted law enforcement for assistance to interview Adam, Susan, and Susan's boyfriend. Adam and Susan's boyfriend were home, and the caseworker interviewed them. Once Susan arrived home, law enforcement arrested her for two outstanding warrants. Susan stated that she did not have anyone with whom to place Adam while she was in jail and that Adam's father was not around and would not pass the Department's criminal background check. The Department was unable to locate contact information for Adam's father. The Department ruled out placement with Susan's boyfriend because he had a criminal history with several felonies. The Department also ruled out a neighbor suggested by Susan for placement.

3

The affidavit stated that the Department requested to be named temporary managing conservator of Adam because he did not have a stable residence to live in that would meet his everyday essential needs. According to the affidavit, Adam reported that there was no shower or bath in the home and sometimes he does not eat because his mother does not have money to buy food. At the time of removal, the Department believed that there was a continuing danger to Adam's physical health and safety if he was returned to Susan and that continuation of Adam's placement with Susan would be contrary to Adam's welfare.

Evidence at Trial

Testimony of Susan

Susan testified that the CPS case originated in Harris County, where she was living at the time with Adam and her ex-boyfriend. She explained at trial that she believed Adam was removed from her care because she was going to jail for assault and that the Department was "afraid she was going to run with [Adam]" even though she had not.

Susan testified that at the beginning of the case Adam was staying with her cousin, but after her cousin chose not to keep Adam anymore, Adam went into foster care. Susan lived with her brother-in-law for about six months and helped "fix up" his home in hopes that Adam could live with the brother-in-law while she completed her court-ordered services. When she learned that Adam could not be placed with

4

her during the pendency of the case, she moved out of the brother-in-law's house. According to Susan, she did everything in her power to find relative placement or kinship placement for Adam.

Susan testified that she had a "treatment plan" when the case was in Harris County, but when it was transferred to Montgomery County, she never received a service plan. Susan testified she was aware of the services the trial court had ordered for her to participate in and she participated in anger management, parenting classes, and substance abuse counseling for four or five weeks but "COVID hit and they shut down the classes" and she had not completed them "due to COVID." According to Susan, she asked three days before trial if she could start her classes again. Susan testified that she had a psychiatric assessment done in Harris County but could not remember the name of the person doing the assessment. Susan attended Alcoholics Anonymous as often as she could and checked herself into rehab, but she was medically discharged due to problems with swallowing. She last attended an Alcoholics Anonymous meeting the week prior to trial. She testified her last drug test for the CPS case was in November—about five months prior to trial—and although she failed the test, she "d[id]n't even see how that's possible[.]" She testified she did not believe any of the drug tests in the case were accurate. She testified she could not see how any of her drug tests in 2019 were positive for methamphetamine because she had not used methamphetamine since Adam was

born. Susan did admit to using marijuana since her son's birth, and that prior to his birth, she used methamphetamine and marijuana, both of which she started using at age eighteen. According to Susan, she went to drug testing "every time they asked me to go." When asked if she was supposed to take random drug tests as part of her service plan, she responded, "I don't know. They've never given me a service plan."

Susan testified that she had a pending criminal case against her for assaulting a nurse, but she did not remember being at the hospital or anything about the incident. She said the incident was from a month before the Department took possession of Adam and it happened when she was hospitalized after someone had attacked her and hit her three times in the face with a bat.

According to Susan, since November of 2020 she had lived in a two-bedroom travel trailer by herself that was given to her by a family friend she only knew by the nickname "Scooter," and the trailer is on property where she paid $500 in monthly rent and $100 for monthly electricity. Susan testified that she had filed the "paperwork" to convert the travel trailer into her name and was awaiting an appointment to "go down there and do it." Photographs of the travel trailer were admitted into evidence. Susan testified that at the time of trial she was "self-contracted" and was a sitter for a person suffering from dementia for three months. At the time of trial, Susan was enrolled in online classes with Lone Star to become a network analyst. Susan testified she owned a vehicle and that she had automobile

6

insurance but, despite driving since she was twelve years old, she had never obtained a valid Texas driver's license.

Susan testified that she received $783 per month from SSI for her bipolar disorder and $450 per week from her work. Susan testified that she was diagnosed with bipolar disorder at age fifteen. She testified she took bupropion for her bipolar disorder, Lamictal, and another prescription she could not remember, and she explained that she had a hard time remembering doctor's appointments "and stuff like that" because she "got smacked in the face with a bat" the previous year.

According to Susan, she missed two visits with her son because on one occasion she was in an automobile accident on the way to the visit and, on another occasion, she forgot about the scheduled visit "because of [her] having memory problems." Susan testified she spent $15,000 on clothes, food, and school supplies Adam needed while he has been in CPS care.

According to Susan, since the case began, she had learned how to hold her temper, coping skills, and how to trust people more. Susan testified that she felt she had a safe home for her son and that it would be in Adam's best interest to live with her. She explained at trial that if her son had stayed with her, he would not have been exposed to COVID in a public school, and that she worried that he was going to be concerned about not seeing his mother. Susan testified that she was in a better place

than when CPS first got involved, she was trying to be the best parent possible for Adam, she did not have a boyfriend, and her focus was on Adam and school.

Testimony of Department Caseworker

The Caseworker testified that she was the caseworker from October until April in Montgomery County and that another caseworker had the case in Montgomery County before her. According to the Caseworker, the case originated in Harris County. The Caseworker testified that she had sporadic contact with Susan, but she explained to Susan the services that were court ordered, and she made referrals for Susan for those services. Susan's service plan was admitted at trial. Susan's service plan required her to participate in a psychological evaluation, psychiatric evaluation, random drug screenings, substance abuse assessment, and treatment services issued by a therapist. Susan was also required to provide her caseworker with verification of attendance at services and to maintain a drug/alcohol free lifestyle.

The Caseworker testified that Susan did not participate in the required services. The Caseworker testified that Susan was ordered to drug test once or twice a month but while the Caseworker was assigned to the case Susan never drug tested. The Caseworker testified that Susan did not provide financial support for Adam during the time the Caseworker had the case, and the Caseworker was not aware that Susan provided financial support for Adam at any time during the case. The

8

Caseworker testified that Susan brought Adam clothing and shoes but "would make them into gifts." The Caseworker testified that, although she had asked Susan numerous times to provide her address, Susan had not done so. Susan also told the Caseworker that she would provide her proof of employment but never provided proof of employment. The Caseworker testified that during the case there were periods of time when the Caseworker could not get in touch with Susan. According to the Caseworker, Susan was required to attend visits with Adam twice per month but only attended visits with Adam three or four times from October until April. The Caseworker testified that the visits were brief because Susan had the pattern of arriving ten minutes before the visit ended, and although Susan repeatedly talked to Adam about what was wrong with her, the two seemed bonded. The Caseworker agreed that when the case was with the prior caseworker in Montgomery County, Susan partially complied with her service plan but was unsuccessfully discharged after "maybe two months," and Susan later told the Caseworker she could not get her records from the service provider to show the Caseworker because the service provider was supposedly closed due to COVID. The Caseworker testified that Susan never provided proof of her education through Lone Star.

According to the Caseworker, the Department considered all possible relatives, but none were suitable for placement. Adam was placed in a foster-to-adopt placement at the time of trial. The Caseworker testified that Susan has not

9

demonstrated the ability to provide a safe and stable home for Adam. And the Caseworker believed it is in Adam's best interest that Susan's parental rights be terminated because Susan had not complied with services or demonstrated that she had changed or mitigated the concerns and issues that brought Adam into care.

Testimony of Investigator Jasper Brooks

Jasper Brooks, an investigator with the Montgomery County attorney's office, testified that he investigated pictures of Susan's travel trailer that she testified about in a prior hearing to confirm whether the pictures were accurate and whether the RV was in a safe place for her child to live. Brooks also investigated whether Susan was employed. Brooks testified that on April 22, 2021, he went to the address that Susan provided, which was an RV park in Houston. Brooks spoke with the RV park manager and confirmed that Susan stayed there and confirmed exactly where her RV lot was located. According to Brooks, the RV had a padlock on the door, and when he knocked, it appeared no one was home. The following day he returned to the RV and again no one was home. He recorded the license plate that was on the RV and noticed that there were two VIN numbers with one of them being scratched out. Brooks testified that with that information he was able to contact the owner of the RV to determine if the recorded owner was renting the RV to anyone and the owner confirmed that he was the owner. On April 29th, the day before trial, Brooks located the same RV with the same scratched out VIN number at an impound lot. Brooks

testified he was allowed access to the RV and took photographs, which were admitted into evidence. Brooks testified that because the RV was no longer at the RV park where Susan told him she lived and had since been moved to an impound lot, he did not believe Susan lived where she previously reported to him that she lived.

Brooks testified that he also attempted to confirm Susan's employment. According to Brooks, he contacted her alleged employer who said she would provide him with a letter through email confirming Susan's employment, but Brooks never received an email from the employer.

Testimony of Court-Appointed Special Advocate (CASA)

The CASA testified that he was assigned to the case in March of 2020. According to the CASA, one of Adam's relatives was approved for placement but ultimately the placement did not work out. The CASA testified that he had visited regularly with Adam and that Adam has special educational needs. The CASA testified that he attended a recent meeting at Adam's school district and Adam was going to have services for dyslexia, math deficiency, and ADHD. The CASA described Adam as "a charming and wonderful little boy." The CASA testified he believed it was in Adam's best interest for Susan's parental rights to be terminated because the CASA did not believe that Susan could provide Adam a safe and stable home.

<u>Testimony of Stephanie Cole</u>

Stephanie Cole testified that she was the custodian of records for Texas Alcohol and Drugs and that she supplied the records of Susan's drug tests. According to Cole, the records were kept in the regular course of business, it was the regular practice of the Texas Alcohol and Drug Testing Service's business activity to make the records, the records were exact duplicates of the originals, and an employee or representative made the records, transmitted the information regarding acts, events, conditions, opinions, or diagnosis at or near the time of the event.

<u>Drug Test Results</u>

Exhibits admitted at trial reflect that Susan tested positive for methamphetamine and amphetamine on August 14, 2019, October 9, 2019, June 8, 2020, and July 28, 2020. Susan also tested positive for marijuana on June 8, 2020.

<u>Judgments of Conviction</u>

The following judgments of conviction for Susan were offered and admitted at trial: October 21, 2009, conviction for prostitution-2nd; December 16, 2009, conviction for possession of cocaine; October 21, 2010, conviction for trespassing; July 7, 2011, conviction for prostitution-2nd; August 11, 2011, conviction for prostitution; November 21, 2014, conviction for credit/debit card abuse; and October 19, 2018, conviction for assault causing bodily injury.

Issues

In issues one, two, and three, Susan challenges the legal and factual sufficiency of the evidence supporting termination of Susan's parental rights under sections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. In issue four, Susan challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that terminating Susan's parental rights was in Adam's best interest. In issue five, Susan argues the trial court erred in appointing the Department as permanent managing conservator. In issue six, Susan argues she was provided ineffective assistance by trial counsel.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the

13

finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

Statutory Grounds D and E

In her first two issues, Susan challenges the sufficiency of the evidence to support termination of her parental rights under sections 161.001(b)(1)(D) and (E) of the Texas Family Code. As to subsection D, Susan argues that the Department presented no evidence of endangerment immediately prior to Adam's removal and the Department failed to prove the connection between the conditions and the resulting danger to Adam's emotional or physical well-being. As to subsection E, Susan argues that the drug test results, the accuracy of which she contested, alone do not establish a voluntary, deliberate, and conscious course of conduct by Susan. According to Susan, the Department produced no evidence of Adam's environment prior to removal. As for her convictions, she argues that the first five convictions were before Adam was born, the sixth conviction was a few months before he was born, and the last conviction occurred when Adam was four years old. Susan contends that the trial court abused its discretion in admitting the first five convictions into evidence over Susan's counsel's relevancy objection. Susan argues that one conviction of assault does not show a pattern of violent behavior.

We are required to consider the sufficiency of the evidence pursuant to Sections 161.001(b)(1)(D) or (E) if challenged. *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to one of these, it will not be necessary to address the other predicate grounds because sufficient evidence as to only one

15

ground in addition to the best interest finding is all that is necessary to affirm a termination judgment. *Id*. at 232-33. Because the evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *33 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). Endangerment arises when a parent's conduct jeopardizes the child's emotional or physical health. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or

16

omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "A finding of endangerment under subsection E, however, may be based on conduct both before and after removal." *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d at 360). "'[E]ndanger' means to expose to loss or injury[.]'" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367. "'A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *In re L.E.S.*, 471 S.W.3d at 925 (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

In addition, a pattern of drug abuse will support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, prostitution, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d at 361-62 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). A parent's continued drug use when the custody of her child is in jeopardy supports a finding of endangerment. *See In re*

18

*S.R.*, 452 S.W.3d at 361-62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). Further, a factfinder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicated the parent was avoiding testing because she was using illegal drugs. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Allowing a child to live in unsanitary conditions supports a finding that the parent has endangered the child's physical and emotional well-being. *See In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied); *see also In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions . . . may prove endangerment."). The child "need not develop or succumb to a malady due to th[e] [unsanitary] conditions before it can be said that" the child was endangered. *In re P.E.W.*, 105 S.W.3d at 777.

The trial court had evidence that indicated Susan tested positive for methamphetamine and amphetamine on four occasions and that she failed to submit to monthly drug screenings. Even though Susan alleged her failure to submit to regular drug testing was not her fault, the trial court could have reasonably inferred that Susan's failure to submit to these screenings was because she was avoiding the tests because she was still using illegal drugs. *See In re E.R.W.*, 528 S.W.3d at 265. The trial court heard Susan's testimony that she used methamphetamine and

19

marijuana prior to Adam's birth, she had failed a recent drug test, and she had been medically discharged from rehab. Susan admitted that she was facing a recent charge for assaulting a nurse. The trial court heard the Caseworker's testimony that Susan had failed to provide proof of employment and proof of stable and safe housing. The trial court heard Brooks's testimony that the travel trailer Susan reported living in was found on an impoundment lot shortly before trial. The trial court was also presented with evidence of Susan's criminal background including a conviction for drug possession, multiple convictions for prostitution, and a recent conviction for assault causing bodily injury in addition to the other pending assault charge. Also, according to the affidavit attached to the Department's petition, the referral to the Department around the time of Adam's removal reported that Adam was not taking his seizure medication, Susan and her boyfriend at the time used methamphetamine around Adam, there were needles lying around the "shack" where they lived, Adam was locked out of the shack all day, Adam was seen running around barefoot in sewage from toilets, Adam defecated on himself and did not bathe, and other people had to feed and bathe Adam. The affidavit also noted that Adam reported that his home had no bath or shower, and Susan did not have money to buy food for Adam.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that

Susan, through her individual acts or omissions or a course of conduct, endangered Adam's physical or emotional well-being. We conclude that the Department established, by clear and convincing evidence, that Susan committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Susan endangered Adam. *See In re J.F.C.*, 96 S.W.3d at 266. We need not address the sufficiency of the evidence to support a violation of subsection O. *See In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.— Amarillo 2011, no pet.). We overrule issues one and two, and we decline to address issue three.

Best Interest of the Child

In issue four, Susan challenges the legal and factual sufficiency of the evidence to support the trial court's finding that terminating Susan's parental rights was in Adam's best interest. Specifically, Susan argues that there was evidence that Adam and Susan were bonded; there was no evidence or insufficient evidence of Adam's emotional or physical needs or danger to him at the time of trial; no evidence of her parenting ability; no clear and convincing evidence that Susan "did not take initiative of the [court-ordered] services[;]" there was no evidence of the foster home

21

and there was sufficient evidence of Susan's home; the CASA's testimony that Susan could not provide Adam a safe and stable home was conclusory; there was insufficient evidence that Susan's acts or omissions show that her relationship with Adam was improper; and that there was sufficient evidence of her handicap that prevented her from completing services or the handicap was not proven due to her counsel's ineffectiveness as raised in her sixth issue.

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of

22

the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116. The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest.

*See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Because stability and permanence are important in a child's emotional and physical development, termination of parental interests may be in the child's best interest when a parent is unable to provide a stable environment or a reliable source for food, clothing, shelter, and emotional support. *See In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure a parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire

24

record, no reasonable factfinder could form a firm belief or conviction that termination was in the child's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

As for the desires of the child, the Caseworker testified that Adam was bonded with Susan. The Caseworker testified that Adam was in foster-to-adopt placement, and the trial court could have inferred that Adam may have also bonded with his foster placement. But there was no additional evidence presented as to the actual desires of the child. This factor does not weigh heavily in favor of or against terminating parental rights.

Regarding Adam's emotional and physical needs now and in the future, and the possible emotional and physical danger to him now and in the future, the record included reports that Susan and her boyfriend at the time of removal used methamphetamine in Adam's presence and would lock him out of their "shack[,]" as well as evidence that Susan admitted to drug use in the past and repeatedly tested positive for methamphetamine and amphetamine during the pendency of the case, Susan failed to submit to monthly drug screens as required, the travel trailer Susan reported living in was located on an impound lot just prior to trial, Susan continued to drive despite never having obtained a valid driver's license, Susan has a history of criminal behavior, Susan had a recent conviction for assault and had a pending charge for assaulting a nurse, and Susan failed to complete her court-ordered

25

services which included parenting classes and substance abuse treatment. The trial court was entitled to find that this factor weighed in favor of termination.

As to the parental abilities of the parent seeking custody, the evidence showed that Susan failed to comply with nearly every provision of her service plan. Susan had a history of drug use and criminal behavior from which the trial court could have inferred lack of parenting skills. Susan failed to provide proof of a stable and safe home for Adam. This factor weighs in favor of terminating Susan's parental rights.

Regarding the plans for Adam, the Caseworker testified that Adam had special educational needs, and the CASA testified that in foster placement Adam was set to receive services for dyslexia, math deficiency, and ADHD. The evidence showed that Susan was unable to provide proof of a stable and safe home and her criminal behavior and substance abuse continued to pose a potential risk to Adam. Both the Caseworker and the CASA testified that terminating Susan's parental rights was in Adam's best interest. This factor weighed in favor of terminating parental rights.

Regarding Susan's acts or omissions, evidence showed that Susan can be violent and has a history of drug abuse. She failed to submit to drug testing during the pendency of the case, and the trial court could have inferred that Susan was continuing to use drugs. Susan failed to provide proof of a stable and safe home and the trailer she claimed she was living in at the time of trial was located on an impound lot just prior to trial. Susan failed to complete services and address the reasons for

26

Adam's removal. Although Susan blamed her failure to complete services on COVID and her memory loss, on this record we conclude that the trial court could have reasonably disbelieved Susan and found that Susan's acts and omissions weigh heavily in favor of terminating Susan's parental rights.

Having considered the evidence related to best interest and deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight to be given the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in Adam's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Susan's parental rights is in Adam's best interest, and we overrule issue four.

### Appointment of Department as Permanent Managing Conservator

In issue five, Susan argues the trial court erred when it appointed the Department as Adam's permanent managing conservator. Susan argues that although the trial court made a general finding that it was in Adam's best interest that the Department be appointed as the permanent managing conservator, the trial court failed to make the specific findings necessary under section 153.131 of the Texas Family Code.

Conservatorship determinations are subject to review for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We reverse the trial court's appointment of a managing conservator only if we determine it was arbitrary or unreasonable. *In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet.). The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless that court finds that such appointment would not be in his best interest "because the appointment would significantly impair the child's physical health or emotional development[.]" Tex. Fam. Code Ann. § 153.131.

However, as discussed above, sufficient evidence supported the trial court's termination of Susan's parental rights as to Adam, and Anthony's rights were likewise terminated. When the parents' rights have been terminated, Family Code section 161.207 governs the appointment of a managing conservator. *See* Tex. Fam. Code Ann. § 161.207; *In re N.T.*, 474 S.W.3d at 480-81. Section 161.207(a) provides, "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). We cannot conclude that the trial court abused its discretion by appointing the

Department as Adam's managing conservator. *See In re J.A.J.*, 243 S.W.3d at 616; *In re N.T.*, 474 S.W.3d at 480-81. We overrule issue five.

Ineffective Assistance of Counsel

In issue six, Susan argues her court-appointed trial counsel provided ineffective assistance. Specifically, Susan argues that her trial counsel was ineffective in (1) failing to object to Susan's drug tests on the basis of trustworthiness, (2) failing to object to Susan's plan of service on the basis of hearsay, and (3) failing to plead the affirmative defense that her rights under the Americans with Disabilities Act had been violated. According to Susan, these serious and deficient errors prejudiced her because there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A parent who cannot afford to retain counsel in Texas parental-termination cases has a right to an appointed attorney who provides effective assistance. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). Ineffective-assistance-of-counsel claims in parental-termination cases, as in criminal cases, are governed by the United States Supreme Court's two-prong test articulated in *Strickland v. Washington. Id.* at 544-545 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). First, the parent must show that counsel's performance was deficient. *Id.* at 545. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"

29

guaranteed by the Sixth Amendment. *Id.* Second, the parent must show that the deficient performance prejudiced the case. *Id.* This requires showing that counsel's errors were so serious as to deprive the party of a fair trial—a trial whose result is reliable. *Id.*

In examining counsel's performance under the first prong, "we must take into account all of the circumstances surrounding the case and must primarily focus on whether counsel performed in a 'reasonably effective' manner." *Id.* (quoting *Strickland*, 466 U.S. at 687). Counsel's performance falls below acceptable levels only when the "'representation is so grossly deficient as to render proceedings fundamentally unfair[.]'" *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim. App. 1983)). We give great deference to counsel's choices and indulge "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id.* (quoting *Strickland*, 466 U.S. at 689). The challenged conduct will constitute ineffective assistance only when "'the conduct was so outrageous that no competent attorney would have engaged in it[.]'" *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would be different. *Id.* at

549-50. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, a parent must also show that "counsel's 'deficient performance prejudiced the defense[.]'" *In re J.O.A.*, 283 S.W.3d at 344 (quoting *Strickland*, 466 U.S. at 687).

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions. *In re Z.M.R.*, 562 S.W.3d 783, 794 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Susan bears the burden of demonstrating a reasonable probability that her parental rights would not have been terminated if not for her trial counsel's conduct. *See In re V.V.*, 349 S.W.3d 548, 559-61 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Susan did not file a Motion for New Trial or other evidence as to the basis for counsel's reasoning for why he did not object to the drug test results, not object to the service plan, or not plead violation of the Americans with Disabilities Act as an affirmative defense. Because the record is silent as to the reasons for counsel's conduct, we may not speculate to find counsel's performance deficient. *See In re Z.M.R.*, 562 S.W.3d at 793-95; *Walker*, 312 S.W.3d at 623. Without evidence about

31

strategic reasons for counsel's behavior, Susan fails to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See In re M.S.*, 115 S.W.3d at 545; *see also Strickland*, 466 U.S. at 689.

Even if Susan had met *Strickland*'s first prong, she has failed to show that, but for counsel's alleged errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Susan contends that the drug test results which her counsel failed to object to on the basis of trustworthiness were the only evidence of Susan's "actual" drug use and, "[w]ithout this evidence, the [Department] would not be able to show course of conduct." We disagree. There is other evidence in the record of Susan's drug use. Susan testified that she had used methamphetamine and marijuana in the past while her son was living with her, that she did not know why her recent drug tests came back positive. Susan also admitted that she had failed to submit to monthly drug tests, from which the trial court could have reasonably inferred she was avoiding the tests because she was using illegal drugs. The record also includes a copy of a 2009 judgment for Susan's conviction for possession of cocaine. Susan's family service plan, which was admitted into evidence, stated that Susan and her boyfriend had used drugs around Adam.

Susan also argues that other than her plan of service which her counsel failed to object to on hearsay grounds, there is no evidence that would support termination

of her parental rights under section 161.001(b)(1)(D). We disagree based on the evidence we have already discussed above in addressing her sufficiency challenge.

Susan contends that her "rights pursuant to the American[s] with Disabilities Act w[ere] clearly violated, and the record clearly shows she had a disability, and this evidence was never disputed." Even assuming without deciding that the evidence of Susan's alleged memory loss due to being hit in the face with a bat or her alleged bipolar disorder was sufficient to prove she would be entitled to protection under the ADA, Susan fails to explain how or why her alleged conditions or her alleged protection under the ADA would be an affirmative defense to an action to terminate her parental rights. This Court has declined to recognize an alleged noncompliance with the ADA as an available defense in cases involving termination of parental rights. *See In re S.G.S.*, 130 S.W.3d 223, 229-30 (Tex. App.—Beaumont 2004, no pet.); *see also In re C.L.*, No. 07-14-00180-CV, 2014 Tex. App. LEXIS 11104, at *9 (Tex. App.—Amarillo Oct. 7, 2014, no pet.) (mem. op.) (noting a split among the Texas intermediate Courts of Appeals on whether the ADA may be an affirmative defense in a parental-rights termination case).

Additionally, as set forth in our analysis above, the trial court had sufficient evidence in the record to support its findings under section 161.001(b)(1)(D) and (E) and to support the trial court's finding that termination of Susan's parental rights was in Adam's best interest. We overrule issue six.

We affirm the trial court's order of termination.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on August 23, 2021
Opinion Delivered November 4, 2021

Before Golemon, C.J., Kreger and Johnson, JJ.